UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LYNDSEY BALLINGER, et al.,<br>Plaintiffs,<br>v.<br>CITY OF OAKLAND,<br>Defendant. | Case No. 18-cv-07186-HSG<br>**ORDER GRANTING MOTION TO DISMISS**<br>Re: Dkt. No. 32 |

Plaintiffs Lyndsey and Sharon Ballinger brought this challenge to Defendant City of Oakland's Uniform Residential Tenant Relocation Ordinance, under which they were required to pay their tenants nearly $7,000 to move back into their Oakland home. The City of Oakland moved to dismiss. *See* Dkt. No. 32. The Court finds that the Ballingers have not pled a cognizable legal theory and therefore **GRANTS** the City's motion without leave to amend.

## I. BACKGROUND

The Court begins by summarizing the relevant City of Oakland ordinances before turning to the Ballingers' allegations.

### A. City of Oakland Ordinances

In 2003, the City of Oakland passed the Just Cause for Eviction Ordinance, which prohibits landlords from evicting their tenants without cause. *See* Oakland, Cal., Mun. Code ("OMC" or "Code") § 8.22.300–390.[1] The City Council found that Oakland had a "prolonged

---

[1] All OMC provisions cited in this order are included in Exhibit A to the City's Request for Judicial Notice, *see* Dkt. No. 33 ("RJN"), and are also available online at https://library.municode.com/ca/oakland/codes/code_of_ordinances. Because "[m]unicipal ordinances are proper subjects for judicial notice," *Tollis, Inc. v. Cty. of San Diego*, 505 F.3d 935, 938 n.1 (9th Cir. 2007), and the Ballingers do not oppose the request, *see* Opp. at 1 n.1, the Court takes judicial notice of the OMC.

affordable housing crisis" and that similar good cause protections in neighboring cities (such as San Francisco, Berkeley, and Hayward) "have aided community stability and reduced urban problems associated with arbitrary disruption of stable households." OMC § 8.22.300. That ordinance specifies what constitutes good cause for eviction, such as when a tenant fails to pay rent or violates a material term of the lease. *See* OMC § 8.22.360.A.1–2. In addition, two categories of permissible no-fault evictions (as defined in the ordinance) are relevant to this lawsuit.[2] First, a tenant may be evicted if the "owner of record seeks in good faith, without ulterior reasons and with honest intent, to recover possession of the rental unit for his or her occupancy as a principal residence where he or she has previously occupied the rental unit as his or her principal residence and has the right to recover possession for his or her occupancy as a principal residence under a written rental agreement with the current tenants." OMC § 8.22.360.A.8. Second, a tenant may be evicted if the "owner of record seeks in good faith, without ulterior reasons and with honest intent, to recover possession for his or her own use and occupancy as his or her principal residence." OMC § 8.22.360.A.9.

On March 1, 2016, the Oakland City Council adopted Ordinance Number 13358, which requires landlords that evict tenants when withdrawing a unit from the rental market under the Ellis Act to make a relocation payment to the evicted tenants. *See* RJN Ex. B; *see also* OMC § 8.22.450(A).

On January 16, 2018, the Oakland City Council adopted the ordinance at issue in this lawsuit—the Uniform Residential Tenant Relocation Ordinance ("the Ordinance"). *See* First Amended Complaint ("FAC"), Dkt. No. 29-1 Ex. A; *see also* OMC § 8.22.800–870. The City Council found that "all major California rent-controlled jurisdictions surveyed . . . require relocation payments for no-fault evictions" and that evicted tenants "face displacement and great hardship" and "are forced to incur substantial costs related to new housing." *See* FAC Ex. A at 2. Therefore, the Ordinance extended the relocation payment program established by Ordinance

---

[2] Another category allows an owner to withdraw a property from the rental market in accordance with California's Ellis Act. *See* OMC § 8.22.360.A.11. The Ballingers' original complaint contended that Oakland had violated the Ellis Act, *see* Compl., Dkt. No. 1 ¶¶ 99–103, but the amended complaint dropped that legal theory.

2

Number 13358 to other no-fault evictions, including owner move-in evictions and condominium conversions. *See id.* The Ordinance set the uniform relocation payment for qualifying no-fault evictions at $6,500 per unit for studios and one-bedroom apartments, $8,000 per unit for two-bedroom apartments, and $9,875 per unit for apartments with three or more bedrooms. *See* OMC § 8.22.820.A. These amounts were set to increase annually based on the Consumer Price Index adjustment. OMC § 8.22.820.D. Under the Ordinance, a tenant who was ultimately evicted would be eligible for one-third of the uniform relocation payment upon move-in, two-thirds of the uniform relocation payment after having lived in the unit for one year, and the entire amount after two years of occupancy. OMC § 8.22.850.C.

### B. The Ballingers' Allegations

Lyndsey and Sharon Ballinger live with their two children in a three-bedroom home on MacArthur Boulevard in Oakland. *See* FAC ¶¶ 6, 22–23. Both Ballingers are members of the military: Sharon is a nurse practitioner currently stationed at Travis Air Force Base and Lyndsey is transitioning from the D.C. Air National Guard to a part-time role in the California Air National Guard. *Id.* ¶ 22. In 2015, the Ballingers were both active duty personnel in the United States Air Force and received orders to transfer to the Washington, D.C. area. *Id.* ¶ 24. Because they intended to return to Oakland following their assignment in Washington, they "decided to temporarily rent their house while on duty." *Id.* ¶ 25.

The Ballingers leased their MacArthur Boulevard home for one year, beginning on September 13, 2016. *Id.* ¶ 26; *see also id.* Ex. C (lease agreement). After the one-year lease expired, it would convert to a month-to-month tenancy. *Id.* ¶ 26. Because Oakland had not yet passed the Ordinance, the lease "did not anticipate . . . a payment requirement, nor did it specifically acknowledge that the Ballingers intended to return to the home and use it as their primary residence." *Id.* ¶ 27.

In late 2017, the Ballingers learned that they would be reassigned to the Bay Area. *Id.* ¶ 28. The following March, the Ballingers gave their tenants sixty days' notice to vacate the MacArthur Boulevard house. *Id.* ¶ 29. Pursuant to the Ordinance, the Ballingers informed their tenants of their right to a $6,582.40 relocation payment and paid them half that amount. *Id.* ¶¶ 29–

30. When their tenants vacated the house in late April 2018, the Ballingers paid them the remaining $3,291.20 required under the Ordinance. *Id.* ¶¶ 31–32. However, the Ordinance forced the Ballingers to make the relocation payment "before the tenants claimed or incurred any relocation costs and without any means to verify how or where they would spend the money." *Id.* ¶ 33.

### C. The Ballingers Bring Suit

The Ballingers brought suit against the City of Oakland on November 28, 2018. *See* Dkt. No. 1. They filed the FAC on February 26, 2019, asserting six causes of action: (1) a facial Takings Clause claim for physical taking of private property for a private purpose, FAC ¶¶ 43–53; (2) facial and as-applied claims for unconstitutional exaction of private property, *id.* ¶¶ 54–64; (3) an as-applied claim for an uncompensated and unconstitutional physical taking, *id.* ¶¶ 65–73; (4) facial and as-applied claims for an unreasonable seizure in violation of the Fourth Amendment, *id.* ¶¶ 74–84; (5) an as-applied claim for violation of due process, *id.* ¶¶ 85–95; and (6) a claim for unconstitutional interference with the obligation of contract, *id.* ¶¶ 96–104. The Ballingers seek a declaratory judgment, permanent injunction, damages, fees, and costs. *See id.* (Relief Sought).

### D. Oakland Moves to Dismiss

Oakland moved to dismiss the amended complaint on March 12, 2019. *See* Dkt. No. 32 ("Mot."). The Ballingers opposed on March 25, *see* Dkt. No. 34 ("Opp."), and Oakland replied on April 2, *see* Dkt. No. 35 ("Reply"). The Court held a hearing on the motion on April 11, 2019. *See* Dkt. No. 36 (minute entry).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on

its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). And even where facts are accepted as true, "a plaintiff may plead [him]self out of court" if he "plead[s] facts which establish that he cannot prevail on his . . . claim." *Weisbuch v. Cty. of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (quotation marks and citation omitted).

If dismissal is appropriate under Rule 12(b)(6), a court "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (quotation marks and citation omitted).

## III. DISCUSSION

Oakland moves to dismiss all six of the Ballingers' causes of action, as well as their requests for injunctive and declaratory relief. The Court begins with the Ballingers' three Takings Clause causes of action before turning to their other constitutional causes of action.

### A. Takings Clause Claims

The Takings Clause of the Fifth Amendment provides that "[n]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. A person who has suffered a taking at the hands of a local government may bring a claim in federal court under 42 U.S.C. § 1983 to obtain just compensation. *See Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2172 (2019).

The Supreme Court has drawn a distinction between two types of takings: physical takings and regulatory takings. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321 (2002). With respect to physical takings, the Fifth Amendment's

"plain language requires the payment of compensation whenever the government acquires private property for a public purpose, whether the acquisition is the result of a condemnation proceeding or a physical appropriation." *Id.* The same holds true for "total regulatory takings," where the government "seeks to sustain regulation that deprives land of all economically beneficial use." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1026–27 (1992). By contrast, the Fifth Amendment "contains no comparable reference to regulations that prohibit a property owner from making certain uses of her private property." *Tahoe-Sierra*, 535 U.S. at 321–22. Thus, a challenge to a regulatory taking requires "essentially ad hoc, factual inquiries." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). The government need compensate for a regulatory taking "only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole." *Yee v. City of Escondido*, 503 U.S. 519, 523 (1992); *see also Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."). Given the "longstanding distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other," the Supreme Court has warned that it is "inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." *Tahoe-Sierra*, 535 U.S. at 323.

At first glance, this case would seem to fit within the regulatory taking category. After all, the Ballingers challenge a city ordinance that regulates how they make use of their property. But that is not the theory the Ballingers have chosen to pursue.[3] Rather, according to the Ballingers, the Ordinance is an unconstitutional physical taking because it forces them to "turn over private funds to other private persons." FAC ¶ 45; *see also* Opp. at 4. Because the "plaintiff is the master of the complaint," *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398–99 (1987), the Court will

---

[3] In fact, the Ballingers dropped their regulatory taking claim when they filed the FAC. *See* Compl., Dkt. No. 1 ¶¶ 65–72.

6

analyze their claim as pled.

### i. Physical Taking for Private Purpose

The Ballingers' first cause of action asserts that the Ordinance, on its face, commands a physical taking of private property for a private purpose, in violation of the Fifth Amendment. *See* FAC ¶¶ 43–53. The City contends that this cause of action must be dismissed "because it does not state an independent claim, but rather is a redundant attempt to challenge the issue of whether the Ordinance serves a public purpose." Mot. at 6. Oakland relies on *Rancho de Calistoga v. City of Calistoga*, in which the Ninth Circuit held that a "'private takings claim' cannot serve as an independent means to challenge an alleged regulatory taking" but instead "must function as part of the larger regulatory takings claim." *See* 800 F.3d 1083, 1092 (9th Cir. 2015); *see also MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1129 n.5 (9th Cir. 2013) (assuming without deciding that regulatory private taking claim was cognizable, despite being aware of no court that has ever recognized such a claim). The Ballingers assert that *Rancho* does not apply, because it was a regulatory takings case, and they are asserting a physical taking of their property. Opp. at 4.

The Court agrees that *Rancho*'s limitation does not apply to the Ballingers' physical taking claims. The Supreme Court has cautioned that courts should "not apply . . . precedent from the physical takings context to regulatory takings claims." *Tahoe-Sierra*, 535 U.S. at 323–24. And in a challenge to a physical taking, a plaintiff may assert that property was taken for a private purpose in violation of the Fifth Amendment. *See Kelo v. City of New London*, 545 U.S. 469, 477 (2005) (noting that "it has long been accepted that the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation"); *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 245 (1984) ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void."). The Court notes that the term "public use" is construed broadly, to "afford[] legislatures broad latitude in determining what public needs justify the use of the takings power." *Kelo*, 545 U.S. at 483. But ultimately the Court need not—and, practically speaking, cannot—decide whether there was a valid public use, because it concludes that there was no taking. Accordingly, the Court **GRANTS** the motion to dismiss the first cause

of action.

### ii. Unconstitutional Exaction of Private Property

In their second cause of action, the Ballingers assert that the Ordinance is an unconstitutional exaction of private property because it conditions the exercise of their right to regain possession of their property on paying their tenants a relocation stipend. *See* FAC ¶¶ 55–57. Oakland argues that this claim must be dismissed because the exaction analysis does not apply, and even if it did, the Ordinance satisfies the constitutional requirements.[4] The Court begins with an overview of the unconstitutional exactions doctrine before turning to its applicability here.

#### a. Unconstitutional Exactions

The "unconstitutional conditions doctrine" exists to "vindicate[] the Constitution's enumerated rights" by ensuring that "the government may not deny a benefit to a person because he exercises a constitutional right." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) (internal quotation omitted). One "special application" of this general principle is the exactions doctrine, which exists to "protect[] the Fifth Amendment right to just compensation for property the government takes when owners apply for land-use permits." *Id.*

The modern exactions doctrine was first articulated in *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987). There, the California Coastal Commission told the Nollans that it would grant them a development permit to rebuild their oceanfront home only if they created a public easement so that beachgoers would have continued access to the shore. *Id.* at 828–29. The Supreme Court reaffirmed that "land-use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests' and does not 'den[y] an owner economically viable use of his land.'" *Id.* at 834 (alterations in original) (quoting *Agins v. Tiburon*, 447 U.S. 255, 260 (1980)). However, the Court found that conditioning the permit on the creation of a

---

[4] Oakland also argued that the Ballingers' claim "is not ripe for adjudication because [they] do not allege that they have exhausted state law procedures for obtaining compensation," Mot. at 8, as was required by *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195 (1985). Since this motion was submitted, the Supreme Court overturned *Williamson County*. *See Knick*, 139 S. Ct. at 2179. Thus, failure to exhaust no longer creates a prudential barrier to federal court adjudication and the Court will proceed to the merits.

8

public easement lacked a nexus with the original purpose of the building restriction, which had been to protect visual access to the beach. *See Nollan*, 483 U.S. at 837. Therefore, the condition was not a valid land-use regulation but rather an attempt to advance state interests without compensation, which amounted to an unconstitutional exaction. *See id.* at 841–42.

Seven years later, in *Dolan v. City of Tigard*, the Supreme Court considered a challenge to the city's attempt to condition approval of a redevelopment permit on the property owner dedicating roughly 10% of her property to an improved floodplain and a pedestrian and bicycle path. *See* 512 U.S. 374, 379–80 (1994). The Court held this permit condition to be an unconstitutional exaction, because the city had failed to show a "rough proportionality," meaning an "individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Id.* at 391.

Most recently, in *Koontz*, the Supreme Court identified "the central concern of *Nollan* and *Dolan*: the risk that the government may use its substantial power and discretion in land-use permitting to pursue governmental ends that lack an essential nexus and rough proportionality to the effects of the proposed new use of the specific property at issue, thereby diminishing without justification the value of the property." 570 U.S. at 614. There, the Court held that the exactions doctrine prohibited the government from making "[e]xtortionate demands for property," meaning that a property owner could sue when the government denied a permit for refusing to accept its conditions. *See id.* at 606–07. In addition, the Court held that monetary exactions—a requirement that a property owner spend money, rather than give up a property interest—were subject to the nexus and rough proportionality requirements. *Id.* at 612.

### b. Applicability of Exaction Framework

Oakland contends that the Ordinance cannot be analyzed under the exaction framework because no property was transferred to the City and because generally applicable legislation is not subject to the exaction analysis. *See* Mot. at 8–9. The Court considers each argument in turn.

### 1. Transfer of Property Interest

According to Oakland, the exaction framework does not apply, because the "Ordinance works no transfer of a property interest from Plaintiffs to the City." Mot. at 9. The Court does not

9

find the analysis nearly so simple and declines to rule on this ground.

The Supreme Court has made clear that when the government takes physical possession of private property, there is a taking. *See Koontz*, 570 U.S. at 615 (noting that policy that demanded a "transfer [of] an interest in property from the landowner to the government . . . would amount to a *per se* taking similar to the taking of an easement or a lien"); *see also Tahoe-Sierra*, 535 U.S. at 322 ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner . . . ."). But "statutes regulating the economic relations of landlords and tenants are not *per se* takings." *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987). And the California Supreme Court has determined that *Nollan* and *Dolan* apply only when the government requires a "property owner [to] convey some identifiable property interest." *Cal. Bldg. Indus. Ass'n v. City of San Jose*, 351 P.3d 974, 990 (Cal. 2015).

Despite the City's characterizations, none of the cases it cites stand for the principle that the property must necessarily be transferred to the *government* to constitute a taking. After all, in *Nollan*, it was the general public, not the government, that benefitted from the creation of a public easement to increase beach access. *See* 483 U.S. at 837. Similarly, the Ballingers have at least a plausible argument that although no money is transferred to the government, it is still put to public use because it helps to reduce rental costs and prevent displacement. Moreover, *Kelo* makes clear that the Takings Clause prohibits physical takings of real property for purely private purposes. *See* 545 U.S. at 477. But the Court ultimately need not resolve this dispute because it finds that the Ordinance cannot constitute a physical taking for the simpler reason that it is generally applicable legislation.

### 2. Generally Applicable Legislation

Alternatively, Oakland contends that "generally-applicable legislation is not subject to an exaction analysis." Mot. at 9. The Court agrees, because the exaction doctrine exists to prevent the government from using its coercive power to demand unconstitutional conditions in adjudicative settings, not to impede the enforcement of generally applicable laws. *See Koontz*, 570 U.S. at 614 (noting that "direct link between the government's demand and a specific parcel of real property" led to "the risk that the government may use its substantial power and discretion

10

1  in land-use permitting" to exact unconstitutional conditions).

2  In *McClung v. City of Sumner*, the Ninth Circuit considered a challenge to a city ordinance requiring that all new developments include storm drain pipes at least 12 inches in diameter. *See* 548 F.3d 1219, 1227 (9th Cir. 2008). The court applied a *Penn Central* regulatory takings analysis, after concluding that the *Nollan/Dolan* framework applied only to "adjudicative, individual determinations conditioning permit approval on the grant of property rights to the public" and not "general land use regulations." *Id.* It noted that extending *Nollan/Dolan* would mean "subject[ing] *any* regulation governing development to higher scrutiny and raise the concern of judicial interference with the exercise of local government police powers." *Id.* at 1228.

The Ballingers argue that *McClung* does not apply because "it was not clear that the restriction at issue was actually an exaction, rather than a standard land use regulation." Opp. at 12. Perhaps—but the same is true here. To be sure, one court in this district has held that the *Nollan/Dolan* exaction framework applies to a city ordinance requiring a monetary payment before an owner may withdraw a housing unit from the rental market. *See Levin v. City & Cty. of San Francisco*, 71 F. Supp. 3d 1072, 1082–83 (N.D. Cal. 2014). In so holding, Judge Breyer found that "*Koontz* abrogated *McClung's* holding that *Nollan/Dolan* does not apply to monetary exactions, which is intertwined with and underlies *McClung's* assumptions about legislative conditions." *Id.* at 1083 n.4.

But this Court finds more persuasive Judge Chhabria's conclusion that *Koontz* did not overrule *McClung*. *See Bldg. Indus. Ass'n—Bay Area v. City of Oakland*, 289 F. Supp. 3d 1056, 1058 (N.D. Cal. 2018). Judge Chhabria noted that "the Ninth Circuit and the California Supreme Court have expressly stated that a development condition need only meet the requirements of *Nollan* and *Dolan* if that condition is imposed as an 'individual, adjudicative decision.'" *Id.* (quoting *McClung*, 548 F.3d at 1227; citing *Ehrlich v. City of Culver City*, 911 P.2d 429, 447 (Cal. 1996)). As noted in *Building Industry Association*, the "exactions doctrine . . . has historically been understood as a means to protect against abuse of discretion by land-use officials with respect to an individual parcel[] of land, and *Koontz* itself spoke of it in those terms." *Id.* at 1058–59. Limiting the exactions doctrine to adjudicative decisions makes sense, because it is in this

11

context that the government can most easily use its considerable power and discretion over permitting to extract concessions from landowners when it would otherwise be required to pay just compensation.

By contrast, property owners may exercise their political power to oppose generally applicable legislation that regulates their property in a manner that they view as burdensome or unfair. *See San Remo Hotel L.P. v. City & Cty. of San Francisco*, 41 P.3d 87, 105 (Cal. 2002) ("While legislatively mandated fees do present some danger of improper leveraging, such generally applicable legislation is subject to the ordinary restraints of the democratic political process."); *see also Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) (Holmes, J.) ("General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule."). Local governments frequently pass laws that alter the value of property. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982) (noting that the Supreme Court "has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails" and collecting cases). A system in which every city ordinance was subject to an unconstitutional exaction challenge would be unworkable.

In sum, although it may be true that "lower courts have divided over whether the *Nollan/Dolan* test applies in cases where the alleged taking arises from a legislatively imposed condition rather than an administrative one," *Cal. Bldg. Indus. Ass'n v. City of San Jose*, 136 S. Ct. 928 (2016) (Thomas, J., concurring in denial of certiorari), the Ninth Circuit has provided the answer for this Court. The Ordinance did not constitute an unconstitutional exaction because it was generally applicable legislation, meaning that the Ballingers' exaction claim fails as a matter of law. Accordingly, the Court need not engage in the comparatively fact-intensive analysis of determining whether there was a nexus and rough proportionality.

\* \* \*

The Court finds that the Ballingers have not, and cannot, plead an unconstitutional exaction claim based on the Ordinance and thus **GRANTS** the motion to dismiss this cause of action.

### iii. Physical Taking

In their third cause of action, the Ballingers contend that the Ordinance is "an unconstitutional physical taking of property as applied to Plaintiffs," because it forces them to transfer money to their tenants or otherwise "face severe financial penalties." *See* FAC ¶ 67–70. The City argues that this cause of action must be dismissed because the Ordinance's "requirement that money transfer between two private parties does not create a physical taking of that money." Mot. at 14–16.[5]

The "classic taking" is one "in which the government directly appropriates private property for its own use," *Tahoe-Sierra*, 535 U.S. at 324 (internal alteration and quotation omitted), such as when the government requires landlords to allow the installation of television cables on buildings, *Loretto*, 458 U.S. at 421. The constitutional protection against *per se* takings without just compensation applies equally to the physical appropriation of personal property as it does to real property. *See Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2426–27 (2015) ("The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home.").

But no precedent supports the Ballingers' argument that legislation requiring the payment of money constitutes a physical taking, triggering the just compensation requirement. To the contrary, a plurality of Justices in *Eastern Enterprises v. Apfel* agreed that the Coal Act's creation of an obligation to pay money to fund the health care costs of retired miners did not constitute a physical taking. *See* 524 U.S. 498, 540 (1998) (Kennedy, J., concurring) ("[The Coal Act] does not operate upon or alter an identified property interest . . . . The law simply imposes an obligation to perform an act, the payment of benefits. . . . To call this sort of governmental action a taking as a matter of constitutional interpretation is both imprecise and, with all due respect,

---

[5] Oakland also argued that the Ballingers failed to exhaust state-law procedures for obtaining compensation, Mot. at 12, but the ripeness doctrine was overruled by *Knick*, 139 S. Ct. at 2179.

13

unwise."); *id.* at 554 (Breyer, J., dissenting) ("The 'private property' upon which the [Takings] Clause traditionally has focused is a specific interest in physical or intellectual property. . . . This case involves not an interest in physical or intellectual property, but an ordinary liability to pay money, and not to the Government, but to third parties."). The courts of appeal that have considered this question have held that *Eastern Enterprises* established that "the mere imposition of an obligation to pay money does not give rise to a claim under the Takings Clause." *W. Va. CWP Fund v. Stacy*, 671 F.3d 378, 387 (4th Cir. 2011); *see also Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1339 (Fed. Cir. 2001) (finding that "five justices of the Supreme Court in *Eastern Enterprises* agreed that regulatory actions requiring the payment of money are not takings"). This Court agrees that *Eastern Enterprises* is the law: the obligation to pay money is not a taking. *See Banks v. Cty. of San Mateo*, No. 16-CV-04455-YGR, 2017 WL 3434113, at *13 (N.D. Cal. Aug. 10, 2017) (noting lack of precedent in the Ninth Circuit and following *Eastern Enterprises* to find that "the charging of fees does not constitute a violation of the Takings Clause").

Nor has the holding of *Eastern Enterprise* been altered by subsequent authority. *Koontz* held only that monetary exactions in the permitting process were subject to *Nollan/Dolan* scrutiny because they burdened the ownership of an identifiable parcel of land. *See* 570 U.S. at 613–14. But it did not bring all general legislation requiring the transfer of money within the realm of the Takings Clause. The Ballingers also point to *Horne*, in which the Supreme Court held that "a governmental mandate to relinquish specific, identifiable property as a 'condition' on permission to engage in commerce effects a per se taking." *See* 135 S. Ct. at 2430. But money is not specific, identifiable property. Rather, "[u]nlike real or personal property, money is fungible." *United States v. Sperry Corp.*, 493 U.S. 52, 62 n.9 (1989). And just because an ordinance mandates the transfer of wealth, that "does not convert regulation into physical invasion." *Yee*, 503 U.S. at 530. To hold otherwise would make it impossible for state and local governments to exercise their "broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Loretto*, 458 U.S. at 440. Finally, it is difficult to envision how exactly the City of Oakland would

14

pay just compensation for an ordinance requiring the payment of money between two private parties.

The Court finds that the Ballingers' physical taking claim is not cognizable and therefore **GRANTS** the motion to dismiss the third cause of action.

### B. Fourth Amendment Seizure

The Ballingers' fourth cause of action asserts that the Ordinance constitutes an unreasonable seizure of their money and real property. *See* FAC ¶¶ 74–84. The City contends that this cause of action must be dismissed because "[r]egulation of private activity is not state action," and even if the Fourth Amendment were applicable, the seizure would not be unreasonable. *See* Mot. at 17.

Under the Fourth Amendment, a seizure "occurs when there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook Cty.*, 506 U.S. 56, 61 (1992) (internal quotation omitted). Though most familiar in the criminal context, the Fourth Amendment's protections also apply "in the civil context." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 51 (1993). But the Constitution constrains only state action. *Blum v. Yaretsky*, 457 U.S. 991, 1003 (1982). And "state action requires *both* an alleged constitutional deprivation caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible, *and* that the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (internal quotations omitted).

In the Ballingers' view, "the Ordinance forces the Ballingers and others to choose between one of two City-authorized seizures for tenant benefit—your home or your money—or face substantial penalties." Opp. at 16. And because the City has created a "catch-22 seizure situation," the logic goes, it is subject to the constraints of the Fourth Amendment. *See id.*

Even assuming for the sake of argument that the Ballingers have alleged a seizure of either their house or money, they have not met the preliminary requirement of alleging that a state actor caused the deprivation. The Ballingers cite a Fourth Circuit case, *Presley v. City of Charlottesville*, for the proposition that the state action requirement is met because the "City

authorized and compelled a seizure of money by third parties." Opp. at 15. In *Presley*, trespasses to land committed by private citizens were attributed to the city because it knowingly published an erroneous map that encouraged the public to use a hiking trail that trespassed through the plaintiff's property. *See* 464 F.3d 480, 487–88 (4th Cir. 2006). Here, by contrast, the only state action is the passage of the Ordinance requiring the payment of money to tenants who are evicted for no fault of their own. But the "subtle encouragement" of passing a law "is no more significant than that which inheres in the State's creation or modification of any legal remedy," and finding it to be state action would destroy the "essential dichotomy between public and private acts." *Am. Mfrs.*, 526 U.S. at 53 (internal quotation omitted). The City's mere authorization, as opposed to encouragement, is not state action. *See Am. Mfrs.*, 526 U.S. at 52; *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 164–66 (1978) (holding that actions by private actors taken pursuant to state statute are not state action).

Accordingly, because the Ballingers have not alleged a constitutional deprivation at the hands of a state actor, the Ballingers' Fourth Amendment claim fails as a matter of law and the Court **GRANTS** the motion to dismiss this cause of action.

### C. Due Process Violation

In their fifth cause of action, the Ballingers assert that the Ordinance does not rationally advance any legitimate governmental interest and is arbitrary, particularly because of its retroactive nature, which violates the Fourteenth Amendment's guarantee of due process. *See* FAC ¶¶ 85–95. The City moves to dismiss, asserting that the Ordinance is not retrospective and that it even if it was, it survives rational basis review. *See* Mot. at 17–20.[6]

A "regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 542 (2005). "To constitute a violation of substantive due process, the alleged deprivation must 'shock the conscience and offend the community's sense of fair play and decency.'" *Sylvia*

---

[6] In its opening brief, the City also argued that "the due process claim is subsumed by the Takings Clause." Mot. at 17. In response, the Ballingers clarify that they are bringing a substantive due process claim, Opp. at 17, which the City agrees is not subsumed by the Takings Clause, Reply at 12.

16

*Landfield Tr. v. City of Los Angeles*, 729 F.3d 1189, 1195 (9th Cir. 2013) (quoting *Marsh v. Cty. of San Diego*, 680 F.3d 1148, 1154 (9th Cir. 2012)). A law is not retroactive just because it "upsets expectations based in prior law," but only if it "attaches new legal consequences to events completed before its enactment." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269–70 (1994). But even "[r]etrospective economic legislation need only survive rational basis review in order to pass constitutional muster." *Gadda v. State Bar of Cal.*, 511 F.3d 933, 938 (9th Cir. 2007); *see also Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992).

The Ballingers' substantive due process claim fails as a matter of law because they do not meet the "extremely high" burden, *Richardson v. City & Cty. of Honolulu*, 124 F.3d 1150, 1162 (9th Cir. 1997), of showing that the Ordinance is arbitrary and irrational. First, the Ordinance is not retrospective, because although it upset the Ballingers' expectations about the costs of evicting their tenants, it does not attach any new legal consequences to events completed before its passage. *See Franceschi v. Yee*, 887 F.3d 927, 940 (9th Cir. 2018) (holding that statute revoking driver's licenses for failure to pay past-due taxes did not operate retroactively because it was "dependent on a taxpayer's current conduct . . . and not on past conduct"). Second, the Ordinance passes rational basis review, regardless of whether it acts retroactively. The City Council's legislative purpose, to promote community stability and help tenants avoid displacement and high moving costs, was a legitimate one. *See Pennell v. City of San Jose*, 485 U.S. 1, 12–13 (1988) (holding that protection of tenants is legitimate governmental purpose); *Apartment Ass'n of Greater L.A. v. City of Beverly Hills*, No. CV 18-6840 PSG (EX), 2019 WL 1930136, at *7 (C.D. Cal. Apr. 17, 2019) (upholding challenge to relocation payment ordinance against substantive due process challenge). And the Ordinance is rationally related to that legitimate end because it shifts some of the costs of relocation from tenants evicted for no fault of their own onto their landlords based on the size of the rental property and the duration of the tenant's occupancy. *Cf. Guggenheim v. City of Goleta*, 638 F.3d 1111, 1122 (9th Cir. 2010) (en banc) (upholding rent control ordinance against substantive due process challenge). Thus, the Ballingers have not satisfied the extremely high bar of showing that the duly-passed Ordinance shocks the conscience so as to violate their substantive due process rights.

The Court **GRANTS** the motion to dismiss the due process claim because it concludes that the Ballingers have not pled any facts to reasonably support the conclusion that the Ordinance is impermissibly retroactive, arbitrary, or irrational.

### D. Contract Clause

The Ballingers' sixth and final cause of action asserts that the Ordinance violates the Constitution's Contract Clause. FAC ¶¶ 96–104.

The Contract Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. The "Contract Clause limits the power of the States to modify their own contracts as well as to regulate those between private parties" but "does not prohibit the States from repealing or amending statutes generally, or from enacting legislation with retroactive effects." *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 17 (1977). The Clause is "narrowly construe[d]" in order "to ensure that local governments can effectively exercise their police powers." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

To assess whether "laws affecting pre-existing contracts violate the Clause," courts engage in a two-step inquiry. *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018). First, courts determine whether the state law has "operated as a substantial impairment of a contractual relationship." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978). This step includes considering "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822. And "when considering substantial impairment, [courts] focus on the importance of the term which is impaired, not the dollar amount." *S. Cal. Gas Co.*, 336 F.3d at 892. Second, if there is substantial impairment, courts look to the "means and ends of the legislation," *Sveen*, 138 S. Ct. at 1822, including whether there is a "significant and legitimate public purpose behind the regulation," *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983). When the government is not a party to the contract, courts must "defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Id.* at 413 (internal quotation omitted).

18

The Court finds that the Ordinance does not substantially impair the agreement between the Ballingers and their tenants. Tellingly, the Ballingers are not able to muster any precedent to support their arguments. And given the "existence of extensive regulation" of the landlord-tenant relationship, the Ballingers could not reasonably have expected the regulatory landscape to remain unchanged indefinitely. *See id.* at 416 (finding no impairment of reasonable expectations where parties recognized "existence of extensive regulation" in field); *see also Rancho de Calistoga*, 800 F.3d at 1091 (noting that "those who do business in a regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end") (internal quotation and alterations omitted); *Chi. Bd. of Realtors, Inc. v. City of Chicago*, 819 F.2d 732, 737 (7th Cir. 1987) (considering extent of prior landlord-tenant regulation and denying motion for preliminary injunction on Contract Clause claim). After all, when they leased their house, the Ballingers would have been required to make a relocation payment to a tenant they evicted under the Ellis Act. The Ordinance simply extended this obligation to include no-fault evictions for owner move-ins. And the Ordinance does not prohibit owner move-ins, it just redistributes the costs so that tenants are not forced to bear the full financial brunt of being evicted. Thus, the relocation payment is not a "ransom requirement," Opp. at 21, but merely one more regulation added to the stack of those governing the relationship between Oakland landlords and their tenants.

The Court finds that the Ballingers have not alleged a substantial impairment of their contractual relationship and thus **GRANTS** the motion to dismiss the Contract Clause cause of action.

### E. Standing to Pursue Injunctive or Declaratory Relief

Oakland contends that the Ballingers lack standing to pursue either injunctive or declaratory relief and that these claims for relief must be dismissed. Mot. at 22–23. The Ballingers do not respond to this argument.

A plaintiff "must show standing with respect to each form of relief sought." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 978 (9th Cir. 2011). To establish standing, a plaintiff "must have suffered an injury-in-fact that is fairly traceable to the challenged conduct and that is

19

likely to be redressed by a favorable judicial decision." *California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018). And when a plaintiff seeks prospective injunctive relief, he must establish "a real and immediate threat of repeated injury" so as to show "a sufficient likelihood that he will again be wronged in a similar way." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (quotations omitted).

Given that the Ballingers did not oppose this ground for dismissal, and the Court has dismissed the substantive claims, the Court declines to rule on whether the Ballingers have adequately pled standing to pursue injunctive or declaratory relief.

## IV. CONCLUSION

The Court finds that the Ballingers have failed to plead a cognizable legal theory on any of their constitutional challenges to the Ordinance and thus **GRANTS** the motion to dismiss. Further, the Court grants the motion without leave to amend because it finds that leave would be futile, as counsel for the Ballingers acknowledged at the hearing that the factual underpinnings are not disputed. Of course, in granting this motion, the Court does not opine on the wisdom or the effectiveness of the Ordinance in alleviating what is undoubtedly a housing crisis in the Bay Area. *Cf. Miralle v. City of Oakland*, No. 18-CV-06823-HSG, 2018 WL 6199929, at *4 (N.D. Cal. Nov. 28, 2018) (noting that "the question before the Court is not whether the City's policy approach" to addressing the "homelessness crisis" is "the ideal policy approach"). But the Ballingers lack a cognizable legal claim for the reasons discussed above, and that finding ends the Court's inquiry here.

The Clerk is directed to close the case and enter judgment in favor of Defendants.

**IT IS SO ORDERED.**

Dated: 8/2/19

HAYWOOD S. GILLIAM, JR.
United States District Judge